UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.: 2:09-CR-09-FtM-29-DNF
2:09-CR-52-FtM-29-DNF

VOLUME THREE OF THREE

---

THE UNITED STATES OF AMERICA,

Plaintiff,

vs.

GILBERTO RIOS,

Defendant.

Fort Myers, Florida
January 7, 2010

9:04 a.m.

---

TRANSCRIPT OF JURY TRIAL, DAY THREE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR PLAINTIFF: Office of the United States Attorney
2110 First Street
Suite 3-137
Fort Myers, FL 33901
(239) 461-2200
BY: DOUGLAS MOLLOY, ESQ.
Assistant United States Attorney

FOR DEFENDANT: Federal Public Defender's Office
1514 Broadway
Kress Building, Suite 301
Fort Myers, FL 33901
(239) 334-0397
BY: RUSSELL K. ROSENTHAL, ESQ.

REPORTED BY: JEFFREY G. THOMAS, RPR-CRR
Official Federal Court Reporter
United States Courthouse
2110 First Street, Suite 2-194
Fort Myers, FL 33901
(239) 461-2033

I N D E X

| January 7, 2010 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 3 | 355 |
| Proffer of Testimony by the Defense | 3 | 355 |
| Response by the Government | 3 | 358 |
| Further Argument by the Defense | 3 | 358 |
| Order of Court | 3 | 359 |

\- - -

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibits 14 and 15 Admitted in Evidence | 3 | 359 |

\- - -

DEFENDANT'S WITNESSES

| WITNESS | DIRECT Vol. | DIRECT Pg. | CROSS Vol. | CROSS Pg. | REDIRECT Vol. | REDIRECT Pg. | RECROSS Vol. | RECROSS Pg. | VOIR DIRE Vol. | VOIR DIRE Pg. |
|---|---|---|---|---|---|---|---|---|---|---|
| YOLANDA RIOS | 3 | 360 | 3 | 366 | | | | | | |
| CARRADO LAZZIZZA | 3 | 368 | 3 | 369 | | | | | | |

\- - -

| | Vol. | Page |
|---|---|---|
| Defense Rests | 3 | 370 |
| Renewal of all Motions and Objections by Defense | 3 | 371 |
| Order of Court | 3 | 372 |
| Charge Conference | 3 | 372 |
| Closing Argument by Mr. Molloy | 3 | 379 |
| Motion for Mistrial by Defense | 3 | 384 |

| | Vol. | Page |
|---|---|---|
| Response by the Government | 3 | 386 |
| Order of Court | 3 | 386 |
| Closing Argument by Mr. Rosenthal | 3 | 387 |
| Final Argument by Mr. Molloy | 3 | 401 |
| Jury Charge | 3 | 404 |
| Objections by Defense | 3 | 419 |
| Response by the Government | 3 | 419 |
| Further Argument by the Defense | 3 | 420 |
| Order of Court | 3 | 420 |
| Verdict | 3 | 422 |
| Polling of the Jury | 3 | 422 |
| Jury Released | 3 | 423 |
| Adjudication of Guilt | 3 | 423 |
| Concluding Discussions | 3 | 424 |
| Certificate of Court Reporter | 3 | 426 |

* * *

THEREUPON, the above-entitled case having been called to order, the following proceedings were held herein, to-wit:

- - -

THE COURT: Good morning. Mr. Rosenthal, where are we at?

MR. ROSENTHAL: Judge, a couple things. We do intend to call one witness that I do think will be short. There is a possibility of a second one that may be even shorter than that.

I spoke with Mr. Molloy about this, this morning. What we wanted to do, through the testimony of Mr. Lazzizzera, who was not the witness I was speaking of, was to . . . if the Court recalls, there was testimony by the officers that the fingerprints of the other individuals in the room, and the person that rented the room, were not submitted for comparison. The officers did not know whether those individuals had, in fact, been previously arrested, which would mean that their fingerprints would be available to be submitted.

What I wanted to do was to have -- call Mr. Lazzizzera simply for the purpose of saying that, through his investigation, he learned that all of these individuals had, in fact, been arrested in the past. Mr. Molloy doesn't have any objection to that as a

procedure, although technically it may well be hearsay. His problem with it is one of relevance. So the question -- so what we'd ask the Court to rule on would be the issue of relevance. If it's relevant, then the government doesn't have any objection to that procedure.

THE COURT: Tell me how it's relevant.

MR. ROSENTHAL: It's relevant for that precise reason, is that the officers . . . we have fingerprints within the safe that did not come back to Mr. Rios. We have other individuals whose fingerprints were not submitted for . . . were not submitted for comparison. The officers had indicated that they did not know whether these individuals had been arrested before. Had they been arrested before, their fingerprints would have been available to be submitted for comparison.

THE COURT: Well, your fingerprints would have been available for comparison, too; but what does that add to the case? The testimony is clear that the fingerprints that were identifiable were identified as not being your client's, and whether anyone else could have had their prints taken . . . or compared, I guess would be the phrase --

MR. ROSENTHAL: But these were individuals that were, in fact, associated with the room.

THE COURT: So where does that get you anyplace

else? You know it's not your client's fingerprints, and the jury knows it's not your client's fingerprints.

MR. ROSENTHAL: That's correct. But in terms of our argument to -- our argument to the jury that this was a step that the officers could have taken to learn whether or not these -- whether these were the individuals whose prints were on the items inside the safe. I mean, if the explanation is we didn't do it because we've never been arrested before, they didn't have our prints, that's one thing. But if they didn't submit their prints simply because they chose not to, then that's a different issue.

THE COURT: Well, it may be a different issue. I have a harder time seeing why either way is relevant. When you have the answer that the prints that were found are not your client's, whether they were or were not of the . . . the other people in the room . . . . I mean, if they were or weren't, how does that further your case?

MR. ROSENTHAL: Well, if they were -- say, for example, had they been Robert Merrel's prints, then that certainly would have been exculpatory, because that was the person who registered the room, and the position that the government is taking is that he didn't have any involvement in this other than registering the room. He wasn't the one staying there. If his prints were, in fact, on the drugs, then that would have been highly exculpatory evidence.

THE COURT: I frankly doubt that. You're still in the same position that -- I mean, it's somebody's prints. The jury knows that. It's at least one person's prints. I don't know if it's one or two.

Mr. Molloy, let me hear from you.

MR. MOLLOY: The objection is relevance, Your Honor. The argument can still be made that no other prints were compared, but, you know, the fact that Mr. Merrel or the other two women may have had a criminal history is just simply not relevant to this case. They're not here, they're not testifying, they're . . . . We just have a real problem with relevance in this case.

THE COURT: It seems to me the only possible relevance is if there's an argument that the police investigation was so deficient that it creates reasonable doubt, as opposed to learning whose fingerprints that is. I don't see that that particularly matters, since we know that it was not your client. Is that where you're going with it?

MR. ROSENTHAL: That is part of the argument; yes, sir.

THE COURT: And is your witness able to say that those three people were fingerprinted?

MR. ROSENTHAL: He's able to say that -- well, the testimony from Lieutenant Aument, I believe it was, was that, if they were arrested, they would have been

fingerprinted. The witness will be able to say that, based upon our investigation, these people have been arrested. We're not going to ask what they've been arrested for, it's just a question have they been arrested in the State of Florida, and that's it.

THE COURT: All right. I'll allow that. I think it's, as you can tell from my comments, minimally relevant, at best; but I'll allow it, either by stipulation or by testimony. I do think it's hearsay, but that's not been the objection.

MR. ROSENTHAL: Thank you.

THE COURT: All right. Ready for the jury?

MR. ROSENTHAL: Yes, sir.

MR. MOLLOY: Yes, Your Honor.

I don't think I need do this in front of the jury. I moved into evidence the stipulations, but I neglected to ask for a number. And, just for the record purposes, the stipulations would be 14 and 15, if that's permissible.

THE COURT: All right.

Any objections to the receipt of 14 and 15?

MR. ROSENTHAL: No, Your Honor.

THE COURT: 14 and 15 will be admitted, then.

(Government's Exhibits 14 and 15 were admitted into evidence.)

THE COURT: All right. Have the jury step in,

please.

(At 9:12 a.m., the jury was escorted into the courtroom.)

THE COURT: Good morning, ladies and gentlemen.

And, Mr. Rosenthal, you may proceed.

MR. ROSENTHAL: Defense would call Yolanda Rios.

THE COURT: Right up here, please.

THE CLERK: If you would raise your right hand, please. Do you solemnly swear or affirm to tell truth, the whole truth, nothing but truth, in the case now before the Court?

THE WITNESS: Yes, ma'am.

THE CLERK: You may have a seat.

If you would state your full name, spelling your last.

THE WITNESS: Starting with my last?

THE CLERK: State your full name, and then --

THE WITNESS: Yolanda Rios Soto. Soto is my married name, S O T O.

YOLANDA RIOS SOTO,

called as a witness by the Defendant, and having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q Ms. Rios Soto, what's your relationship to the

defendant, Gilberto Rios?

A He's my brother.

Q And how are you employed?

A I have two jobs. I work for Labor Solutions for Baxter Troutman, and Two by Four Ranch, for Tony Camarado.

THE COURT: You're going to need to move a little bit closer to the microphone, or move it closer to you. There you go.

BY MR. ROSENTHAL:

Q And how long have you had those two positions?

A Labor Solutions I have worked since 2004. And Tony Camarado, which is the Two by Four Ranch, I've been there a year.

Q And what city, or what area of Southwest Florida, do you reside in?

A DeSoto County.

Q And back in 2000 -- I'm sorry, in May of 2009, where was your brother living?

A With my mom.

Q And where did she live?

A 128 South Osceola, Arcadia, Florida.

Q In Arcadia?

A Yes, sir.

Q Okay. Now, back in that time period, in, say, 2008 and 2009, did you and your brother own a vehicle?

A Yes, sir.

Q All right. And what kind of vehicle was that?

A It was a 1997 Ford Expedition.

Q And when you say the two of you owned it, how was it titled?

A It was titled Gilberto Rios and Yolanda Rios Soto.

Q And why was it -- why was it titled in both of your names?

A Insurance liability. I put it on mine.

Q Okay. Who did the car actually belong to?

A My brother, Gilbert Rios.

Q He was the one that drove it?

A Yes, sir.

Q He was the one that purchased it?

A Yes, sir.

Q Why was your name on the title?

A Insurance reasons.

Q Did you have an insurance policy?

A Yes, sir.

Q Who was that through?

A Geico.

Q Was that car put on your policy?

A Yes, sir.

Q Did there come a time when that vehicle was sold?

A Yes, sir.

Q All right. And, if I were to show you documents, would it refresh your recollection as to when that -- when the vehicle was sold?

A Yes, sir.

MR. ROSENTHAL: Your Honor, may I approach?

MR. MOLLOY: I'm sorry. Just . . . I'm assuming that . . . I think the predicate question is does she remember when it was sold.

THE WITNESS: Not really, sir.

BY MR. ROSENTHAL:

Q Do you remember the exact date and the exact time it was sold?

A No, sir.

Q If you were to see documents, would it refresh your recollection as to the date and time it was sold?

A Yes, sir.

Q And, first of all, the documents that I'm showing you, are these -- are you familiar with these documents?

A Yes, sir.

Q And how did you obtain these documents?

A I went to DeSoto -- I mean to the DMV.

Q You went to the Department of Motor Vehicles?

A Yes, sir.

Q And when did you do that?

A Yesterday.

Q Okay. Now, in looking through these documents, can you tell us, does it refresh your recollection as to the date when that -- when the vehicle was sold?
A April 21st.
Q Of what year?
A 2009.
Q All right. And is that . . . . So, after looking at the documents, do you now recall that it was April 21st of 2009?
A Yes, sir.
Q All right. And when that -- what was your involvement in the sale of the vehicle?
A It was on my lunch hour, and I just went and signed the title.
Q Were you involved in the negotiations?
A No, sir.
Q Do you know who the buyer was?
A Mr. Ulysses Ramirez.
Q And do you know who Mr. Ramirez is?
A A little bit.
Q Okay. He's not somebody you know well?
A No, sir.
Q All right. Now, what . . . once this transaction was completed -- well, did you, in fact, sign the title?
A Yes, sir.

Q And after you signed the title, what else did you do?
A I got the tag, the tag to the Expedition, and I had to leave, because I remember it was on my lunch hour.
Q And do the documents that you were shown refresh your recollection as to what you did with the tag after you --
A I took it to the DMV in DeSoto County and surrendered it.
Q And at what time did you do that?
A I know it was on my lunch hours.
Q If I were to show you the same documents, would it refresh your recollection?
A Yes, sir.
(Examining document) it's right here. It was at 12:48.
Q 12:48 in the afternoon.
A Yes, sir.
Q Now, was this -- was this a cash transaction?
A Yes, sir.
Q All right. And who received the cash?
A My brother, Gilbert Rios.
Q Do you know how much the sales price was?
A No, sir. I just went, signed it, I seen the cash, but I didn't see what kind of cash it was.
Q Do you know how much it was?
A It was $3,500.

Q All right. Do you know what the denominations were?
A No, sir.
Q Okay. You don't recall seeing the denominations?
A I just seen cash. That's it. I didn't see what --
Q Now, do you know if Mr. Ramirez has, in fact, reregistered the vehicle in his name?
A I don't know, sir.

MR. ROSENTHAL: All right.

That's all I have, Your Honor.

THE COURT: Mr. Molloy?

MR. MOLLOY: Just a few questions.

CROSS EXAMINATION

BY MR. MOLLOY:

Q Ma'am, why wasn't -- I mean -- I'm sorry. Why, again, was your name on the title? You said for insurance reasons?
A To add it on my insurance.
Q And why was that? Why didn't Mr. Rios just get it insured?
A I have a husband, and we work. And I know he's working too, but I put it under my insurance. That's why. I just asked, and I offered myself to put it in my insurance. So when I put it on Geico, I went ahead and put it on my name too.
Q Is there any particular reason why Mr. Rios just

didn't put it on his insurance?

A No, sir.

Q And you went and got these documents yesterday?

A Because of the -- I didn't recall, I didn't remember the day that I surrendered the tag, but it was the day of the processing. And I remember I just signed it. I said I got to go to work. And had I to go back to work, because I do have two jobs.

Q So it would be fair to say that you weren't really part of the transaction? You just signed on off on it?

A No, sir. I just signed off on it, got the tag, God bless you.

MR. MOLLOY: Nothing further.

THE COURT: Mr. Rosenthal?

MR. ROSENTHAL: Nothing further.

THE COURT: May stand down. Thank you.

(The witness, having been excused from the witness stand, left the courtroom.)

MR. ROSENTHAL: Your Honor, our next witness will be Dino Lazzizzera.

THE COURT: Come forward, please.

THE CLERK: Do you solemnly swear or affirm to tell the truth, the whole truth, nothing but the truth, in the case now before the Court?

THE WITNESS: I do.

THE CLERK: You may have a seat.

MR. ROSENTHAL: Could you state your name, please? Good.

THE CLERK: Go ahead.

MR. ROSENTHAL: You do it much better than I do.

THE CLERK: If you would state your full name.

THE WITNESS: My name is Carrado Lazzizzara. L A Z Z I Z Z A R A.

THE CLERK: Would you spell your first name, please?

THE WITNESS: Carrado. C A R R A D O.

THE CLERK: Thank you.

CARRADO LAZZIZZARA,

called as a witness by the Defendant, and having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q What name do you go by?

A Dino Lazzizzara.

Q What is your occupation?

A I am an Investigator with the Federal Public Defender's Office for the Middle District of Florida.

Q Is that here in Fort Myers?

A Yes, it is.

Q And were you involved in the investigation as it

related to the case against Gilberto Rios?

A Yes, I was.

Q And, in the course of that investigation, did you take steps to ascertain whether specific individuals had previously been arrested?

A Yes.

Q All right. Based upon your investigation, was Robert Merrel previously arrested in the State of Florida?

A Yes, he was.

Q Was Nicole Smith previously arrested in the State of Florida?

A Yes, she was.

Q Was Refugian Rosales previously arrested in the State of Florida?

A Yes, she was.

MR. ROSENTHAL: No further questions.

THE COURT: Mr. Molloy?

CROSS EXAMINATION

BY MR. MOLLOY:

Q How long have you been working for the public defender's office as an investigator?

A Going on three years now.

Q Okay. And so you were working in that capacity the day Mr. Rios got arrested on May 9th -- it's May 7th. May 7th of 2009.

A Yes, I was.

Q And when did you learn that the three people that Mr. Rosenthal asked you about had been arrested?

A I would imagine probably a couple weeks after I got the case.

Q Okay. Which . . . would it be right around that time frame?

A Exactly.

Q Did you obtain the fingerprints of any of those people?

A No, I did not.

MR. MOLLOY: Nothing further.

THE COURT: Mr. Rosenthal?

MR. ROSENTHAL: Nothing further.

THE COURT: You may stand down. Thank you.

(The witness, having been excused from the witness stand, sat in the courtroom.)

THE COURT: You may call your next witness.

MR. ROSENTHAL: At this time, the defense would rest.

THE COURT: Mr. Molloy, anything else from the government?

MR. MOLLOY: No, sir.

THE COURT: Ladies and gentlemen, the testimony portion of the case has been completed. We are going to

take a brief recess -- and, by briefly, I anticipate 10 or 15 minutes.

What the lawyers and myself are going to do is review the jury instructions; that is, the legal instructions that I am going to give at the end of the case. The lawyers have the right to know what it is I am going to tell you before they make their closing arguments. So we are going to take care of that for the next 10 or 15 minutes. We'll come back in, you'll hear from the lawyers, I'll give you my instructions, and then you'll begin your deliberations.

You still cannot discuss the case among yourselves. So I will get you back as soon as we can.

(At 9:23 a.m., the jury was escorted from the courtroom.)

THE COURT: Be seated, please.

All right, counsel, let's go over the draft jury instructions. I think they're actually all pattern instructions.

MR. ROSENTHAL: Your Honor, before we do that, and before I forget, can I renew all previous --

THE COURT: Sure. Go ahead.

MR. ROSENTHAL: I would renew the motion for judgment of acquittal, pursuant to Rule 29, at the close of all evidence. I'd also renew all previously made motions

and objections, including the motion to suppress.

THE COURT: All right.

Does the government oppose the motions?

MR. MOLLOY: Yes, Your Honor.

THE COURT: The Court would deny each of the motions. The motion to suppress for the reasons previously stated; and the renewed motion for judgment of acquittal, the Court finds that the -- a reasonable jury could certainly find sufficient evidence to convict the defendant as to each of the two counts.

All right. With regard to the draft jury instructions, any objection to the unnumbered first page?

MR. MOLLOY: No, Your Honor.

MR. ROSENTHAL: No, Your Honor.

THE COURT: The presumption of innocence, seems to me, since the defendant did not testify, we'll strike Page 2 and give the pattern that's on Page 3. Any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 4, the definition of reasonable doubt, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 5, and Page 6, consideration of the evidence, any objections there?

MR. MOLLOY: No, Your Honor.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 7, credibility of witnesses, any objections?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Impeachment, I think we end up striking Page 8 and giving the version on Pages 9 and 10, which is the impeachment/inconsistent statements -- I'm sorry, that's wrong. We give Page 8, and we strike Page 9 and 10, because the defendant did not testify.

All right. Any objections, then, to the impeachment instruction on Page 8?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Going over to Page 11, expert witness, any objections there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 12, the introduction to the offense, or offenses, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 13, the possession with intent instruction, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 14, the possession of a firearm, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: That continues on to Page 15.

Page 16, the possession instruction, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 17, the on or about, knowing, willfully instruction, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 18, the caution on punishment, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Page 19, duty to deliberate, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: And, finally, Page 20, any objection there?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Is there any instruction that I have not included in this packet that anyone thinks should be given?

MR. MOLLOY: None from the government.

MR. ROSENTHAL: No, Your Honor.

THE COURT: All right. Let's take a look at the verdict form. Any objection to either the Count 1 form or the Count 2 form?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: All right. I have a redacted indictment. As you know, the Court's practice is to send the indictment, as well as the instructions, back with the jury. I don't think we redacted it enough, because we did it before you stipulated to the felony conviction. So what I would propose is to redact Count 2 so that it reads, "Having been convicted of the following crime punishable by imprisonment for a term," not terms, "exceeding one year, to wit, a felony," and then delete the identity of that felony, so it picks up, "Did knowingly possess in and affecting commerce."

Anyone see that differently?

MR. MOLLOY: No, Your Honor.

MR. ROSENTHAL: So the words, "to wit," would be gone?

THE COURT: No. I mean, they can be gone, but I had not deleted them in my proposal.

MR. ROSENTHAL: I would propose to delete the words, "to wit," since we're . . . .

THE COURT: So it reads, "By imprisonment for a term exceeding one year, a felony"? Or, "That is, a felony"?

MR. ROSENTHAL: I'm sorry. I guess it would be, "to wit, a felony," is the way the Court proposed?

THE COURT: Yes.

MR. ROSENTHAL: That's fine.

THE COURT: And then strike, on the top of the second page, the description of the offense, the location, the number, etcetera.

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: Does that work?

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: All right. Anything else with regard to instructions?

MR. MOLLOY: Not with regard to the instructions, Your Honor.

MR. ROSENTHAL: No, Your Honor.

THE COURT: All right. Both sides ready?

MR. MOLLOY: Your Honor, you wanted to make inquiry of Mr. Rios in regard to his not testifying?

THE COURT: Mr. Rios, I explained to you, yesterday afternoon, about your right to testify or not testify, and I -- my memory is I said, if you didn't testify, we'll assume that it's your choice not to; and if you did, obviously, it's your choice to testify.

You have not been called to testify. Is that your decision, not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that you still have the right to testify if you wanted to.

THE DEFENDANT: Yes, I do.

THE COURT: But this is your opportunity. I mean, your attorney has rested, and I'd let you testify now, but after we go to the jury, that's the end of your opportunity to testify. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: Okay.

All right. Anything else?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: All right. Have the jury step in, please.

(At 9:31 a.m., the jury was escorted into the

courtroom.)

THE COURT: Be seated, please.

Ladies and gentlemen, at this stage of the case, the attorneys will be making their final arguments to you. Counsel for the government will have the opening argument. Counsel for the defendant will then have the opportunity to argue. Then, in conclusion, counsel for the government will have the opportunity to reply, in rebuttal, to the arguments of counsel for the defendant. This is proper under our rules because the government has the burden of proving the case beyond a reasonable doubt.

Counsel, in making their arguments to you, will be commenting upon the testimony that you have heard and the evidence that has been presented. They, as you, will be recalling the testimony and the evidence in the case. They will not intentionally try to mislead you; however, if their recollection of the testimony or the evidence differs from your own recollection, you must follow your own recollection.

These final arguments by counsel are not to be construed by you as the evidence, nor as the instructions on the law; nevertheless, these arguments are intended to help you to understand the contentions of each side, and you should give the attorneys your close attention.

Mr. Molloy?

MR. MOLLOY: Good morning, ladies and gentlemen.

The most telling words in this trial are, "Now you're going to have to get a search warrant."

Gilberto Rios finds himself in a very difficult situation. He's in a hotel room, with a firearm, and methamphetamine, packaged for sale. He's got a couple thousand dollars in cash on him. He's got little bags, and a scale, rubber bands, things which, I would suggest, you would not need for any personal use, and he's got a significant amount of methamphetamine. And he's a convicted felon. And the police are at the door.

After repeated knocks, they're not going away. So he opens the door a crack. He knows what he's got in his room. The police say we've heard about some suspicious activity. We need to come in and talk with you. We want to take a look around your room.

First, he says yes; but then he says no. Because this is in the room (indicating small safe). And this is in the room (indicating pistol). The drugs are in the room. The scales are in the room. The baggies are in the room. The pipe he smokes marijuana with is in the room.

So he says no. Lieutenant Aument says, well, I am going to go get a search warrant. What does he do now? He knows they're going to find them.

Maybe, just maybe, if it's in a duffle bag full of

clothes, and it's locked, they won't find them. I've got to take the chance. Because if they get a search warrant, as opposed just taking a look around the room, maybe I might get away with it.

So, the police find the pipe. Yup. I used it to smoke marijuana. Maybe I'll get off with just that.

The police come around, look in the duffle bags filled with men's clothing. Mr. Rios has paid for the room every day, in cash, for a week. And they find this black box, this semi safe, here. And the policeman picks it up.

Do you have a key?

No. I lost the key a couple days ago.

Maybe that's it. Maybe that's the end.

What's in it?

Papers. Just papers.

Maybe that's it. Maybe that's the end.

Thump. Thump. This firearm is sliding around in it. And he knows that.

Now. Now you have to get a search warrant.

MR. ROSENTHAL: Judge, I'm -- objection, and reserve a motion?

THE COURT: You may. We'll hear argument at sidebar later.

MR. ROSENTHAL: Yes, sir.

MR. MOLLOY: The Judge will tell you that there

are several kinds of possession, and that one of those kinds of possession is possession where you have the power -- not direct possession -- where you have the power and the intention to have control over an item. And that is what the evidence suggests. That is what the evidence demands. Ownership, possession, control, displayed to you by the delays in opening the door, the conversation at the safety latch, the lies about his identification, the lies about people in the room, the . . . saying that there's no drugs in the room. Everything in the room is mine. The drug paraphernalia is his, the lost keys, the description nothing but paper. And finally, now you need to get that search warrant.

The Judge will also tell you that you may make -- he'll say these exact words: "You may make deductions, and reach conclusions, which reason and common sense lead you to make." And that's the deduction that reason and common sense lead you to make in this case.

He will also tell you you're not to be concerned with whether it is direct or circumstantial evidence, that they're both -- that there is no difference. That you can listen to a chain of facts and circumstances tending to prove facts when you consider whether the defendant is guilty or not guilty of the charges against him.

Now, we have possession with intent to distribute

the methamphetamine, a significant amount of drugs. Again, the scale, the money, the packaging, and the stipulations. First of all, not a stipulation, but the chemist tells you, without a doubt, that's methamphetamine. And so the defendant is charged, in the verdict form that you'll have, with possessing, with intent to distribute, a quantity or mixture of a detectable amount of methamphetamine, in violation of law. And the Judge will tell you that possession is in violation of the law, and that -- that possession of methamphetamine. And that the intent to distribute is certainly there, with the thousands of dollars found on Mr. Rios's person, and the duffle bag in his room, the room he paid for, for seven days.

Count 2 charges that, on that date, having been -- Mr. Rios, having been convicted of a crime punishable by imprisonment for a term exceeding one year. Well, you know that to be true, because that's stipulated to, both by the defense and the government. Did possess, in and affecting foreign -- interstate and foreign commerce. Well, you know that that's true, too, the in and affecting interstate and foreign commerce, because that's stipulated to. Possess a firearm.

All the evidence suggests, all the evidence tells you, whose gun, whose drugs, this is. There's not one piece of evidence that suggests the drugs and the gun are not

within his control.

Now, the defense points out that there are two pieces of evidence, two plastic bags, with someone else's fingerprints on them. We don't dispute that. You heard the evidence of the laboratory analyst, a man who has been doing this for over 20 years. He tells you that, just as likely as not, they're not likely to -- just as likely as not in terms of finding fingerprints, and the tests that he went through to find fingerprints.

Again, remember, we talked about CSI, that type of stuff, outside. This is the real chemist, inside, telling you the test, and the things that he went through to determine, on every piece of evidence, they could, whether a fingerprint was able to be . . . Mr. Rosenthal used the term lifted, but developed. And he was unable to. But you see, it shows the conscientiousness of the police. They sent everything to him to be tested. They had his statement, everything in the room is mine. They had -- that it was his hotel room. They had him talking about getting a search warrant for the box, the box that he knew contained the stuff that would convict him. And yet they went ahead and sent it away because that's what they do. Standard operating procedure.

When you have deliberations, please consider, who paid for the hotel room? Who was in the hotel room? When

Mr. Rios was arrested, whose relatives come back to ask for his things? No one else but Mr. Rios's relatives.

What is a convicted felon doing in his hotel room with a pistol and methamphetamine packaged for sale? He finds himself in a very difficult situation. An impossible situation. The only thing he can do, by his actions, show us. He's going to take a chance. Maybe, just maybe, if I let them take a look around the room, they won't find the things to convict me. And it was going okay until Lieutenant Aument picked up the black box, and moved it, and that gun went sliding down.

Mr. Rios had his day in court. I'm directing your attention back to another day, in May of 2009, when, as a convicted felon, he possessed a firearm, and methamphetamine to sell.

Listen carefully to the instructions, because the instructions convict Mr. Rios. Did he have the power, did he have the control, did he have the constructive possession, of the items that he never should have had?

THE COURT: Thank you.

Mr. Rosenthal.

MR. ROSENTHAL: May we approach, Your Honor?

THE COURT: You may.

AT SIDEBAR

MR. ROSENTHAL: At this time, I would object to

the prosecutor's closing argument, and move for a mistrial.

On at least four different occasions, the prosecutor referred to Mr. Rios's refusal to consent to the search of the safe, indicating that he would then require a search warrant. The Court admitted that for the limited purposes of establishing the ownership of the safe. As the Court knows, based upon the case law, it is not admissible to show knowledge that the defendant -- that a defendant expected there to be contraband inside. Nonetheless, that was the government's entire argument as to why -- as to the purpose of that evidence.

I think, at one point, the prosecutor started his closing argument with the words, "The most telling evidence in this case is, 'Now you're going to have to get a search warrant.'" Clearly, he was arguing that that was because the defendant knew there were drugs and guns inside. That is not permissible.

At another point -- and I think this is the point where I objected -- he used the term that he hoped that it would end there; again, arguing, commenting to the jury, or asking the jury to come to the conclusion that, because the defendant said, "Now you're going to have to get a search warrant," that he knew that the contraband was inside. That was not why the Court admitted the evidence.

It's our position that the argument is improper,

it causes the jury to believe that, based upon the defendant exercising his 4th Amendment right, that he knew that there was contraband inside the safe; and, for that reason, we object and move for a mistrial.

THE COURT: Mr. Molloy?

MR. MOLLOY: Your Honor, I believe that the defense attorney, during his questioning of Lieutenant Aument, opened the door as to the ownership of the box, the knowledge that the box was there. I believe that I'm permitted to argue that if -- since he exercised the . . . his ownership of the box by requesting the search warrant, that that certainly implies that he knew what was in it. I don't think that there's a real distinction between the two.

THE COURT: Well, the Court admitted the evidence not literally for ownership, but for possession and control, since ownership isn't an element, but possession is. Having said that, the Court does not find that the government's closing arguments crossed the line such that a mistrial is needed.

Did you want me to instruct the jury with regard to something with regard to that?

MR. ROSENTHAL: I would not make that request. And the reason I would not make the request is that I just think it would call additional attention to the prosecutor's argument.

THE COURT: I think that's a reasonable view.

IN OPEN COURT

MR. ROSENTHAL: May I have just one moment, Your Honor?

THE COURT: Certainly.

MR. ROSENTHAL: May I proceed, Your Honor?

THE COURT: You may.

MR. ROSENTHAL: Good morning.

The starting point in this case, as with every criminal case, are the principles that we discussed a couple of days ago. And that is that the defendant is presumed to be innocent, that the government has the burden to prove the defendant guilty, and that proof must be beyond and to the exclusion of a reasonable doubt. So that is our starting point.

The government's theory in this case seems to be that, although there were others that were associated with the room, although the fingerprints that were found inside the box, or the safe, whatever we choose to call it, did not match the defendant, because he allegedly said, in their view, that everything in the room was his, and that because he allegedly said that there were papers within the safe, that, therefore, the government has proven, beyond a reasonable doubt, that the methamphetamine and the firearm within the safe belong to him.

Our response has been that there were at least three other people associated with this room. There was no evidence as to who brought the safe into the room. That he, along with others, were at the hotel. And that, basically, because he was living with his mother, he was at the hotel to, essentially, have a good time.

Now, in looking at the government's case -- and what I would ask you to do, and what I would suggest you should do, is to look at the last two government witnesses. That was Mr. Balunan and Victoria Broadstreet. That was the chemist from the Florida Department of Law Enforcement. And what -- I want you to compare these very two professional witnesses, and compare the way they went about their investigation in the case to the remainder of the government's case.

You recall the testimony from Ms. Broadstreet. I mean, extremely impressive. She indicates that, before she was willing to come into court, and before she was willing to say that this substance was even methamphetamine, that she had to go through these four tests. And she was not going to come in and tell you, beyond a reasonable doubt, that this substance was even methamphetamine until she had gone through those four steps.

Now, let's compare that to the remainder of the investigation.

A single reasonable doubt, a single reasonable doubt as to the defendant's guilt, is sufficient to compel a verdict of not guilty.

Now, the biggest reasonable doubt in this case is obviously the fingerprints. Now, obviously, their purpose in submitting the items within the safe for analysis was to see who it was that had handled the items, perhaps who it was who had placed the items into the safe. When the answer came back that it was not Mr. Rios -- the two fingerprints were lifted, but the fingerprints were not Mr. Rios's -- then, suddenly, in the government's view, this is not important anymore. Now, Mr. Molloy said to you -- and reasonable doubt can arise from the evidence -- the fingerprints inside the safe were somebody else's.

They can also arise from the lack of evidence. In this case, Mr. Molloy had said to you, a moment ago, that the police were very conscientious. They sent everything that they had to the laboratory for analysis.

Well, that's not quite true. They sent Mr. Rios's fingerprints to the laboratory for analysis, but they didn't send the fingerprints of the other people that were associated with the room.

And let me ask you this. Do you think that, if Victoria Broadstreet was the investigator in this case, that she would have failed to send to the laboratory the

fingerprints of the person who -- to whom the room was registered, to the other individuals who were in the room, who we know, based upon the testimony, fingerprints were available, because these were people that had been arrested before in the State of Florida?

Now, the government argues that, you know, this doesn't really matter, because the safe, or -- I'll use the term safe. It just makes it easier. The safe was in a duffle bag, and on top of the duffle bag -- and this is according to Lieutenant Aument's testimony -- there was a bunch of clothes that he thought were men's clothes. Therefore, in the view of the government, that showed that that particular duffle bag, in fact, belonged to Mr. Rios. And it was the government's view that the clothes -- that those particular clothes belonged to Mr. Rios.

The only problem with that -- and this is Lieutenant Aument's testimony -- is that, when he had testified previously, back in October, on the exact same issue, his response at that time, back in October, under oath, with access to all the materials that he has today, or he had yesterday, he says he doesn't remember whether the safe was in a bag that had clothes on top of it or not. He didn't remember if there was anything concealing the -- concealing the safe. Yet that doesn't stop him from coming into court yesterday and telling you, absolutely

 conclusively, that there were clothes on top of the bag.

And I would -- there's an instruction that the Judge is going to give you that deals with credibility of witnesses, and one of the things that it . . . that the Judge will tell you is was there evidence -- in evaluating whether you accept the credibility of a witness or a witness's testimony, whether there was evidence that, at some other time, the witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you at trial.

Now, this is a very crucial issue. The issue of -- I mean, if the safe was in a bag, and Mr. Rios had clothes within the same bag, well, obviously, that's a very strong point in favor of the government. So how in the world, when Lieutenant Aument testifies back in October, is that a fact that he doesn't remember; however, conveniently, at trial, now it's something that he does remember? And I would suggest to you that that means that that is something that you should consider in evaluating his testimony not just on that point, not just on that point, but on everything else that he has to say during the course of the trial.

You know, on that same issue of where the safe was, and what else was in the safe, what else was in the same bag as the safe, you know, we have umpteen photographs,

I stopped counting, of everything in -- that was in the safe, taken from every conceivable angle one can imagine, in every single position one can imagine. You have pictures of the same thing over, and over, and over again.

However, a very crucial issue in this case is what did they find when they found the safe inside the bag? Were there, in fact, clothes on top of it? Was it, in fact, in proximity to the other -- of the other items which Mr. Rios indicated was his? We don't have a photograph that shows that. And again, a very crucial issue in the case. So I would ask you, again, do you think, if Victoria Broadstreet had been the investigator in this case, whether she would have failed to take a photograph of this particular crucial evidence?

Now, the next reason that the government says that it doesn't matter that Mr. Rios's fingerprints were not -- or that the fingerprints in the safe were not Mr. Rios's is because, in the government's -- because the government indicates that he made a statement indicating that there were papers in the safe. Now, assuming that you believe that that's what he said, then I'm not going to argue to you that that's not a point in the government's favor. Obviously, it is a point in the government's favor. Does it prove, beyond a reasonable doubt, that the items within the safe belong to him? If you believe that was said, yeah,

that is a point in the government's favor. It doesn't prove the case, but it's a point in their favor.

But you know what? There's even doubt as to that. And this is a very -- again, this is a very crucial conversation, because this seems to be what the government has hinged its case upon. And every time Lieutenant Aument testifies, he has a different version of how that happened.

You heard that, when he testified back in the summer, he was asked a question did . . . did you ask Mr. Rios if there -- what was in the safe, and he responded papers. Then, when he testified in the fall, his testimony was I asked him about the key, and at that point he volunteered that there were papers -- that there were papers in the safe. Again, this is a very crucial conversation, but, you know, there's sort of a . . . you know, there's sort of a -- I guess you have to ask yourself does Lieutenant Aument really remember what was said?

But there's a larger point. And this may not be a point in Mr. Rios's favor as a human being, but it's a point in his favor in terms of evaluating the evidence in this case. I don't want to say he was being a total jerk in the way he was dealing with Lieutenant Aument, but I think it's fair to say that he was being obstinate. And, you know, he didn't give a correct name, he vacillated on whether they could come in, so when he says there's papers in there,

is . . . you know, is he just -- is that just a way of being obstructive? You know, is that just the first thing that came to his mind?

Now, the government's going to say, well, if the safe is not his, why didn't he just say that the safe is not his? Well, anybody that's been stopped for a traffic ticket, in that circumstance, one does not tend to think that . . . people do not tend to think -- people do not tend to think clearly.

And similarly with the thing about the key. I mean, it's a little bit absurd to believe that the -- the key to the safe was truly lost. I mean, that just may be somebody being a jerk by saying something like that, because we know, given what was in the box, if the key was truly lost, then the box would not have been locked. Because someone is not going to lock the box and know that they don't have any means of opening it.

But we know that it was not something that Mr. Rios had. We know that -- we know that because he was searched. We know that because, according to Lieutenant Aument, after he obtained the search warrant, he came back and did a very thorough search of the room, and did not find the key to the safe.

Well, the key is somewhere. Somebody has it. There was testimony that they did not search, or they don't

believe they had searched, Ms. Smith and Ms. Rosales when they left the room. So did they have the key? We don't know. Is there somebody else out there, maybe the same person whose fingerprints were inside the safe, that may be the person that has the key?

Now, Mr. Molloy talked to you about this concept of what he called constructive possession; and that's one of the things the Judge is going to tell you, as to a basic -- one of the forms of possession, that seems to be what the government is arguing in this case, is constructive possession.

The definition of constructive possession is a person who is not in actual possession, but who has the power and intention to take -- to later take control over something, either alone or together with somebody else, is in constructive possession of it. And that seems to be the government's argument of it.

But if Mr. Rios did not have the key, if somebody else had the key, then that is evidence that he did not have the power and the intent, or the intention, to take control of these items later. The person that had the power and intention to take control of these items later was the person that had the key. We don't know who that is.

Now, the next thing that -- reason why the government wants you to believe that we don't have to worry

about the fact that it was not Mr. Rios's fingerprints within the safe is that -- is with respect to this issue with respect to the currency.

Now, you heard the testimony from Yolanda Rios this morning, and that testimony was uncontradicted. Mr. Molloy could have cross examined her about anything he wanted, so the evidence is essentially uncontradicted that Mr. Rios had come into possession of $3,500 in currency a couple of weeks before the incident. Was he at the hotel, blowing the money? Yes, maybe he was. But nonetheless, even if she had never testified, the one thing that we know about this currency is it doesn't have anything to do with this case.

You know, whoever -- you know, and this -- maybe, was my mistake yesterday, by not being clear, with Detective Muse on the stand, about how people pay money for methamphetamine transactions. But the one thing that it is here is that whoever was involved with the methamphetamine that was in the safe is not some large-scale drug dealer. You know, we were talking about a total amount of maybe, if you add it up all together, maybe two ounces.

And you also heard that, within the safe, there were bags, and inside the bags there were smaller bags. So, whatever . . . whoever was responsible for this methamphetamine was doing so on a retail level, as opposed

to a wholesale level. And that's where I may not have been clear with Detective Muse.

Now, how much sense does it make that somebody that is a methamphetamine user, that is buying methamphetamine, is going to pay for it in crisp $100 bills? I think common sense tells us that that would not be the case. But then again, you also have the testimony of Yolanda Rios.

You know, I agree with Lieutenant Aument on one point, and that is that context is everything. And when the government argues that, well, Mr. Rios said everything in the room was his, and, therefore, that -- that meant the safe, well, the first time he said that, as it turns out, most everything in the room was his. But we know everything in the room was not his because there was women's clothing that was in the room. And when he was asked that question, it wasn't like they were doing an inventory, and saying is this yours, is this yours, is this yours, is this yours, is this yours? He made a blanket statement, according to Lieutenant Aument, yes, everything in the room is mine.

The second time that he said it, the last time he said it is, well, what are you going to do with this property that is left in the room? He never once was asked the question, does this safe belong to you, and he never once said yes, it does belong to me. So, when the

government uses the terminology that he said everything in the room was mine, that doesn't mean that he was saying what the government wants him -- wants to interpret that, that he was saying the safe and the contents and everything in it were his.

The other thing that I think is -- I think one of the more ridiculous suggestions that the government has made is that, because Ms. Rosales and Ms. Smith, or Mr. Merrel, did not show up at the room asking for property, therefore that means that the safe and its contents somehow -- somehow belonged to Mr. Rios. I would suggest to you that that room, at that time, was probably the last place in the world that Ms. Rosales and Ms. Smith wished to return to.

Now, although, as I said, you know, Mr. Rios was being somewhat obstinate with the officer, probably to his detriment, I think the conclusion that he was trying to hide something really has got to be rejected, that his -- if you remember, the question -- you know, the question that he was asked, or the question that he asked, is are you . . . or the question that he asked is -- get a search warrant. That could take a long time. And it was because it was going to take a long time that he agreed to let the officers come into the room.

Now, if you have somebody that is trying to hide contraband, such as the gun and such as the methamphetamine,

is that person really going to be concerned about how long it's going to take? You know, it just doesn't make a whole lot of sense. And then, when the officers came into the room, he was very candid with them about the pipe that he used marijuana. But I would suggest to you that that -- you know, not . . . allowing them to come into the room just because of concerns about time does not sound like somebody that's worried about what they're going to find.

All right. So let's -- I mean, let's look at what's going on here. Well, first of all, I think it's sort of reading between the lines with Miss Cassels' testimony, is, you know, we've sort of walked in on a local thing here. You know, there are undercurrents as far as what's going on in Arcadia. You know, are people willing to talk about certain people, but not willing to talk about other people? You have Mr. Rios that's in a room with two women, and again, this is not -- doesn't say a whole lot about him as a human being, but it -- it works in his favor in this case -- neither of whom are apparently wives or girlfriends. You have marijuana that had apparently been smoked. You had pornography.

The government also talked about these -- and this testimony came from Miss Cassels -- is these people that were outside of Room 317 the morning before -- or immediately before Lieutenant Aument knocked on the door.

And, you know, I'm not really sure who that helps. You know, it would be easy for me to stand here and argue, well, wait a minute, here are people, and these -- evidently, there were other people associated with the room, other than the three people that were in the room. And that could support our argument that there were other people even beyond the three in the room. But, you know, the reality is that I think that testimony was really too sketchy to draw any conclusions as to whether those people were, in fact, associated with Room 317 at all.

You also heard the testimony that there was -- there was five cell phones. Again, no testimony as to who those five cell phones belonged to. Again, that's something that suggests that, perhaps, that there were other people associated with the room other than the three people -- other than the four people that we know about. Who they belonged to is not something the government has presented as evidence.

You know, in the final analysis there's no evidence that Mr. Rios was selling drugs. You know, they don't have a witness. They don't have a single witness who was saying Mr. Rios was selling drugs from that room. According to the government's theory, there would be at least three witnesses. If that was true, they would have at least three witnesses to that.

You know, we've been throwing around the term reasonable doubt. The Judge is going to tell you that reasonable doubt is proof of such a convincing character that you would be willing to rely upon it and act upon it, without hesitation, in the most important of your own affairs. That's how high the government's burden is.

I would suggest to you that the government has met that burden with respect to the testimony of Victoria Broadstreet, and has failed to meet that burden with respect to the rest of the evidence in this case; and we would ask you to return a verdict of not guilty.

THE COURT: Thank you.

Mr. Molloy?

MR. MOLLOY: Reasonable doubt is a real doubt. That's what the Court will tell you. A real doubt.

It's time for you to hear the instructions from the Judge. I'd ask you to listen to them carefully. All the instructions.

One of the most important ones is you may make deductions and reach conclusions which reason and common sense lead you to make. And that is what the evidence specifically shows. Mr. Rios is guilty of the two crimes that he's charged with.

Also listen, you're not to be concerned with whether the evidence is direct or circumstantial. There is

no difference. The chain of facts and circumstances tending to prove facts can lead you to the verdict of guilty.

I could talk to you and go point by point with Mr. Rosenthal's argument. Mr. Rosenthal wants a picture of this box in the duffle bag. What would the police have to do to do that picture? The duffle bag -- the box has already been taken out of the duffle bag. They took pictures of the evidence as it was when they came back from the search warrant. They would have to like restage that. That's not what they did, because that's not standard operating procedure. I'd respectfully suggest to you that the testimony shows you that Lieutenant Aument remembers -- even the three times that he's had to testify, he remembers, without any real difference, any real difference, what was said in that room. That his investigation was thorough. He didn't stop at the statement everything is mine. He didn't stop at the obtaining of this box. He sent it, just like the standard operating procedure, to determine if there were fingerprints, and to determine that the drugs were, in fact the drugs. And, in those two pouches, that is that's a lot of drugs, and that's a lot of money. And a reasonable doubt is not a speculative doubt.

Mr. Rosenthal suggests to you that this is a party, that the defendant was at the hotel to have a good time. With guns, and drugs, and money. A convicted felon.

A little bit more than a local thing.

Think about how this all came to be. The hotel owner sees suspicious activity, people coming and going, doors propped open, people in the hallway in front of Room 317, knocking on the door, pounding on the door, with the cell phones. She does what a responsible person would do. Small town. She goes directly to the sheriff's department, says I don't like what's going on. The police come, they knock on the door, and Mr. Rios is stuck.

Why didn't he say the safe was not his? Because it was. I understand that Mr. Rosenthal didn't get the answer that he was looking for when he said how did people pay for meth. Detective Muse said they pay in hundreds.

I understand Mr. Rosenthal was talking about the items of women's clothing. Well, there were two. A couple. And the vast majority was, evidently, from the seven-day stay of Mr. Rios.

Mr. Rosenthal is in the unenviable position of saying everything in the room is mine doesn't mean everything in the room is mine. When you listen to the instructions, I'd ask to you remember the points Mr. Rosenthal made. Are they speculative doubts? The answer is yes.

If the fingerprints of the other people were so important, the defense knew about arrest records right

around the time of the crime. It's because they're not important. Because this is Mr. Rios's drugs, this is Mr. Rios's gun, this is Mr. Rios's money. He said it, he took a chance that he wouldn't get caught, because he knew that search warrant, if they went ahead and got that search warrant, he knew it was done. So he took the chance. And when they did find --

MR. ROSENTHAL: Objection, Your Honor.

THE COURT: Do you need to discuss it at sidebar, or just reserve?

MR. ROSENTHAL: Reserve, please.

THE COURT: You may proceed.

MR. MOLLOY: He took a chance. And he lost. Convicted felon in possession of a gun he can't have, and drugs he shouldn't be selling.

He's had his day in court. The government's proved its case. The defense has done its job. Now it's time for you to do yours.

THE COURT: Members of the jury, it is now my duty to instruct you on the rules of law that you must follow and apply in deciding the case. When I have finished, you will go to the jury room and begin your discussions, what we call your deliberations.

It will be your duty to decide whether the government has proved, beyond a reasonable doubt, the

specific facts necessary to find the defendant guilty of the crimes charged in the superseding indictment. You must make your decision only on the basis of the testimony and other evidence presented here during the trial, and you must not be influenced in any way, by either sympathy or prejudice, for or against the defendant or the government.

You must also follow the law as I explain it to you, whether you agree with that law or not. And you must follow all of my instructions as a whole. You may not single out, or disregard, any of the Court's instructions on the law.

A superseding indictment is a formal charge against any defendant, and it is not evidence of guilt. Indeed, every defendant is presumed by the law to be innocent.

The law does not require a defendant to prove innocence, or to produce any evidence, at all; and if a defendant elects not to testify, you cannot consider that, in any way, during your deliberations.

The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find that defendant not guilty. Thus, while the government's burden of proof is a strict, or heavy burden, it is not necessary that a defendant's guilt be proved yard beyond all possible doubt. It is only required

that the government's proof exclude any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a real doubt, based upon reason and common sense, after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it, without hesitation, in the most important of your own affairs.

If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said earlier, you must only consider the evidence that I have admitted in the case. The term evidence includes the testimony of the witnesses and the exhibits admitted in the record.

Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you.

Also, you should not assume, from anything I may have said, that I have any opinion concerning any of the issues in the case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decisions

concerning the facts.

In considering the evidence, you may make deductions and reach conclusions which reason and common sense lead you to make, and you should not be concerned about whether the evidence is direct or circumstantial.

Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. Circumstantial evidence is proof a chain of facts and circumstances tending to prove or disprove any fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision, you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness, I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to

tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to observe accurately the things he or she testified about?

Did the witness appear to understand the questions, and answer them directly?

Did the witness's testimony differ from other testimony, or other evidence?

You should also ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact, or whether there was evidence that, at some other time, a witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things, or remember other things inaccurately. So if a witness has made a misstatement, you need to consider whether it was simply an innocent lapse of memory, or an intentional falsehood; and the significance of that may depend on

whether it has to do with an important fact, or with only an unimportant detail.

When knowledge of a technical subject matter might be helpful to the jury, a person having special training or experience in that technical field is permitted to state an opinion concerning those technical matters. Merely because such a witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

At this time, I will explain the superseding indictment, which charges two separate offenses, called counts. I will not read it to you at length, because you will be given a copy of the superseding indictment for your reference during your deliberations.

In summary, Count 1 charges that, on or about May 7, 2009, defendant Gilberto Rios did knowingly and willfully possess, with intent to distribute, a quantity of a mixture or substance containing a detectable amount of methamphetamine, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 851(a)(1) and 841(b)(1)(C).

Count 2 charges that, on or about May 7, 2009, the defendant, Gilberto Rios, having been convicted of a crime punishable by imprisonment for a term exceeding one year,

that is, a felony, did knowingly and willfully possess, in effecting . . . .

Counsel, I think we missed an, "or." It should be, "In or affecting"?

MR. MOLLOY: Yes, Your Honor.

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: All right. Let me start the sentence again.

Count 2 charges that, on or about May the 7th, 2009, defendant Gilberto Rios, having been convicted of a crime punishable by imprisonment for a term exceeding one year, a felony, did knowingly and willfully possess, in or affecting interstate and foreign commerce, a firearm; to wit, a .380 caliber FEG pistol, Model Number AP9, Serial Number AL3786, in violation of Title 18, United States Code, Section 922(g).

Title 21, United States Code, Section 851(a)(1), makes it a federal crime or offense for anyone to possess a controlled substance with intent to distribute it. Methamphetamine is a controlled substance within the meaning of the law. A defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First, that the defendant knowingly possessed methamphetamine as charged; and, second, that the defendant

possessed the substance with the intent to distribute it.

To possess with intent to distribute simply means to possess with intent to deliver, or transfer possession of, a controlled substance to another person, with or without any financial interest in the transaction.

Title 18, United States Code, Section 922(g), makes it a federal crime, or offense, for anyone who has been convicted of a felony offense to possess any firearm in or affecting interstate commerce.

The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First, that the defendant knowingly possessed a firearm in or affecting interstate commerce, as charged; and, second, that before the defendant possessed the firearm, the defendant had been convicted, in a court, of a crime punishable by imprisonment for a term in excess of one year; that is, a felony offense.

The term "firearm" means any weapon which is designed to, or may readily be converted to, expel a projectile by the action of an explosive. And the term includes the frame or receiver of any such weapon.

In this case, the government and the defendant have stipulated that the defendant has been convicted, in a court, of a crime punishable by imprisonment for a term in

excess of one year; that is, a felony offense. The government and the defendant have also stipulated that the firearm in question did move in or affecting interstate commerce. You may therefore accept these facts as proven.

The law recognizes several kinds of possession. A person may be in actual possession or constructive possession. A person may also have sole possession or joint possession. A person who knowingly has direct physical control of something is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it. If one person alone has possession of something, that possession is sole. If two or more persons share possession, such possession is joint.

Whenever the word "possession" has been used in these instructions, it includes constructive as well as actual possession, and also joint as well as sole possession.

You will note that the superseding indictment charges that the offense took place on or about a certain date. The government does not need to prove with certainty the exact date of the alleged offense. It is sufficient if the government proves, beyond a reasonable doubt, that the offense was committed upon a date reasonably near the date

alleged.

The word "knowingly," as that term is used in the superseding indictment or in these instructions, means that the act was done voluntarily and intentionally, and not because of mistake or accident.

A separate crime, or offense, is charged in each count of the superseding indictment. Each charge, and the evidence pertaining to it, should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the offenses charged should not affect your been verdict as to the other offenses charged.

I caution you, members of the jury, that you are here to determine from the evidence in the case whether the defendant is guilty or not guilty. The defendant is on trial only for those specific offenses alleged in the superseding indictment.

Also, the question of punishment should never be considered by the jury, in any way, in deciding the case. If the defendant is convicted, the matter of punishment is for the Judge, alone, to determine later.

Any verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. In other words, to return a verdict, you must all agree.

Your deliberations will be secret. You will never have to explain your verdicts to anyone. It is your duty,

as jurors, to discuss the case with one another in an effort to reach agreement if you can do so.

Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to reexamine your own opinion, and change your mind, if you become convinced that you were wrong; but do not give up your honor beliefs solely because others think differently, or merely to get the case over with.

Remember that, in a very real way, you are judges. Judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you go to the jury room, you should first select one of your members to act as your foreperson. The foreperson will preside over your deliberations, and will speak for you here in court.

A form of form has been prepared for your convenience, and will be sent back with you. It's a two-page form. On Page 1, with regard to Count 1, it says as follows:

"As to Count 1, which charges that, on or about May the 7th, 2009, the defendant, Gilberto Rios, did knowingly and willfully possess, with intent to distribute, a quantity of a mixture or substance containing a detectable amount of methamphetamine, a Schedule I controlled

 substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C), we, the jury, unanimously find defendant Gilberto Rios," then it has two lines. You have the option of not guilty or guilty. Obviously, you check one of those when you've reached a decision.

The form then continues. For Count 2, it reads, "As to Count 1, which charges that, on or about May the 7th, 2009, defendant Gilberto Rios, having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit, a felony, did knowingly possess, in an affecting interstate and foreign commerce, a firearm, to wit, a .380 caliber FEG pistol, Model Number AP9, Serial Number AL3786, in violation of Title 18, United States Code, Section 922(g), we, the jury, unanimously find defendant Gilberto Rios," and again you're given the option, either guilty or not guilty. You check one of those.

The form then says, "So say we all," has a line for the date, and a line for the foreperson's signature.

You will take the verdict form into the jury room, and when you have reached unanimous agreement, you will have your foreperson fill in the verdict form, date and sign it, and then return to the courtroom.

If you should desire to communicate with me at any time, please write down your message, or question, and pass

the note to the court security officer, who will bring it to my attention. I will then respond as promptly as possible, either in writing, or by having you return to the courtroom so I can address you orally. I caution you, however, with regard to any message or question that you might send, that you not tell me your numerical division at any time.

Counsel, did either of you detect any material deviations from the instructions?

MR. MOLLOY: No, sir.

MR. ROSENTHAL: No, Your Honor.

THE COURT: Ladies and gentlemen, I'm going to let you go to the jury room. In a moment, I will send back to you the instructions that I just read, so you have a written copy of those, the verdict form that I read, we'll send you a copy of the indictment -- in this case it's a superseding indictment -- and we'll send you all of the exhibits that have been admitted into evidence for your consideration.

You may deliberate as long as you wish. As we discussed yesterday, if you wish to go past 12:30, that's fine, just let us know. Also, if you wish to have lunch, because of the length of your deliberations, from past experience, you need to tell us that about an hour ahead of time to give us time to get you lunch. You will not be allowed to go outside, but we will bring a lunch in. And if you determine that you are going to need lunch, let us know,

and we'll get that in the works.

All of the instructions I gave you about not discussing the case are lifted. Now is the time you are to discuss the case. So, with that, you will be allowed to go to the jury room and begin your decisions, and we'll await hearing from you.

That's with the exception of Mr. Sockwell and Ms. Houlihan. Just have a seat there.

The rest of you may return to the jury room.

(At 10:40 a.m., the jury was escorted from the courtroom.)

THE COURT: Be seated, please.

You two are the alternates. What that means to you is the instructions I gave you about not talking about the case are not lifted. And what we're going to do is get a telephone number where we can reach you, probably to tell you that we're not going to need your services; but we're going to keep you kind of on call because if, for example, one of the jurors became sick, and couldn't deliberate, instead of having to try the case all over again, we'd call one of you, and have you go to the jury room, and tell the jury they have to begin their deliberations all over again. So we're going to keep you in our back pocket, so to speak, until we hear from the.

We will call you one way or the other, either to

tell you that we need you, or we don't need your services; but I can't tell you when, because we don't know how long the jury is going to be out.

So if you will come on down, give the juror buttons back, and give my courtroom deputy your telephone numbers.

Do either of you have anything in the jury room you need no retrieve? Tell the court security officer what it is, and he'll get it for you.

(Thereupon, the alternate jurors provided contact information to the courtroom deputy, following which they left the courtroom.)

THE COURT: All right. Counsel, if you would take a look at the exhibits, and make sure those are properly lined up, and only the ones that have been admitted go to the jury. We have the redacted indictment. If you would, again, take a look at that. The verdict form, if you'll review. And then, the instructions, we've had fixed that page with regard to the in or affecting. And I've also inserted, as I said, verbally we had omitted the reference to that as a felony, and so I've included that, as well. Take a look at the instructions.

MR. ROSENTHAL: Also, I had objected during the government's closing close.

THE COURT: You're absolutely right.

You may be seated, and we'll hear from you.

MR. ROSENTHAL: Judge, at this point I'm basically renewing the same objection that I had made during the government's opening close with respect to the government was making the argument that the -- Mr. Rios's refusal to consent to search the safe could be used by the jury to infer knowledge that there was contraband inside.

The government indicated at sidebar that it did not believe that there was a problem with that argument. However, as the Court -- that was not the basis upon which the Court admitted the evidence, and such an inference is impermissible, and akin to commenting upon the defendant's exercise of a 5th Amendment right. The government, in closing argument, having heard our argument at sidebar, again made the argument that the jury could make that inference based upon the defendant's refusal to consent to the search of the safe, so I would renew the previous objection, and renew the motion for a mistrial.

THE COURT: All right.

Mr. Molloy?

MR. MOLLOY: Your Honor, again, I would have the same argument I had at sidebar that, once the defense attorney cross-examined . . . once the defense attorney cross-examined Lieutenant Aument, that the . . . idea -- or, I'm sorry, the -- he suggested that other people may have

known about the . . . the box, or the safe, and, therefore, the . . . the questioning became permissible that he had refused the consent to -- he had not consented to search that particular box. I believe the argument was not crossing any line, and appropriate.

MR. ROSENTHAL: The problem is that . . . that was -- what the government just said was why the Court permitted the evidence to come in in the first place. We objected to that at the time. That's fine.

The problem is that the government is now arguing that that evidence can be used for an impermissible purpose; that is, to show that the defendant knew that there was contraband inside. And I think that's the problem with the argument the government was making, that it was not -- they were not using the evidence for the basis upon which the Court admitted it, but rather for the impermissible purpose.

THE COURT: All right. I don't intend to revisit my evidentiary ruling. As we discussed before, I believe we discussed there is no Supreme Court case that anyone found equating the invocation of a 4th Amendment to the -- in the same fashion as the invocation as the right to remain silent, although some circuits, not including the 11th Circuit, have made that determination.

In any event, the Court admitted the testimony as it related to the defendant's dominion and control over the

safe. The government's rebuttal argument, in my view, did not cross the line, particularly in light of your closing argument that clearly argued to the jury that your client, despite what he said, had no dominion and control over the safe. So I don't find any basis to grant the motion, or to grant the mistrial. So those requests will be denied.

Anything else before we are in recess for the jury?

MR. ROSENTHAL: No, Your Honor.

MR. MOLLOY: No, Your Honor.

THE COURT: All right. We'll be in recess until we hear from the jury.

(At 10:49 o'clock, a.m., court was recessed.)

AFTER RECESS

(At 11:16 o'clock, a.m., court was reconvened.)

THE COURT: I'm told we have verdicts.

Have the jury step, in please.

(At 11:21 o'clock, a.m., the jury was escorted into the courtroom.)

THE COURT: Mr. Clark, do I gather you're the foreperson?

JUROR CLARK: Yes, Your Honor.

THE COURT: I'm told that the jury has reached verdicts. Is that correct?

JUROR CLARK: That's correct.

THE COURT: If you'd hand the verdict forms to the courtroom security officer?

Lady and gentlemen, if you'd please rise and listen to your verdicts?

As to Count 1, you have found the defendant guilty. As to Count 2, you have found the defendant guilt.

Are these your verdicts, so say all of you?

(All jurors indicated affirmatively.)

THE COURT: If you'd be seated, please?

Mr. Nolan, are these your verdicts?

JUROR NOLAN: Yes, they are, Your Honor.

THE COURT: Ms. Goff, are these your verdicts?

JUROR GOFF: Yes, they are.

THE COURT: Mr. Gonzalez, are these your verdicts?

JUROR GONZALEZ MEJIA: Yes, they are.

THE COURT: Mr. Macrum, are these your verdicts?

JUROR MACRUM: Yes, they are.

THE COURT: Mr. Fisher, are these your verdicts?

JUROR FISHER: Yes, they are.

THE COURT: Mr. Lee, are these your verdicts?

JUROR LEE: Yes.

THE COURT: Erickson, are these your verdicts?

JUROR ERICKSON: Yes, they are.

THE COURT: Mr. Scott, are these your verdicts?

JUROR SCOTT: Yes, Your Honor.

THE COURT: Mr. Santagata, are these your verdicts?

JUROR SANTAGATA: Yes.

THE COURT: Mr. Henry, are these your verdicts?

JUROR HENRY: Yes, sir.

THE COURT: Mr. Clark, ARE these your verdicts?

JUROR CLARK: Yes, they are.

THE COURT: And, Mr. Medhurst, are these your verdicts?

JUROR MEDHURST: Yes, they are.

THE COURT: I'd like to thank you for your time and attention to the case. All of us do appreciate it. I am going to ask that you call that number after 6:00 o'clock on Friday. I have other cases scheduled for the rest of the month. You may or may not be told could come in or not, but I can't let go just yet. So if you'd call that number, I'd appreciate it.

So if you'd leave us your juror buttons, you are excused with the Court's thanks.

(At 11:23 a.m., the jury was escorted from the courtroom.)

THE COURT: Be seated, please.

Mr. Rosenthal, if you and your client would approach the podium for me, please?

Mr. Rios, based upon the jury verdict, the Court

would adjudicate you guilty of Count 1 of the superseding indictment, and guilty of Count 2 of the superseding indictment.

The Court will scheduled a sentencing. We need to get it through a different computer here. So why don't you have a seat, and we'll give you the sentencing date before we leave today.

If either side wishes to examine the verdict, we'll have it up here, of course, before it gets filed.

All right. We apparently can't access the Court's calendar, so we'll set the sentencing date approximately 90 days out, and do it by separate notice.

MR. ROSENTHAL: Judge, if I can suggest, there's a supervised release violation that's been floating around that hasn't been set. The case number is 09-CR-9. I would suggest that we set the supervised release revocation hearing for the same day as the sentencing. My assumption is the Court would treat the evidence heard at trial as the basis for the supervised release violation.

THE COURT: I assume that's the base for the violation?

MR. ROSENTHAL: Sure.

THE COURT: That makes sense. 09-CR-9?

MR. ROSENTHAL: I believe it's 09-CR-9.

THE COURT: All right. We'll set both of those

for a date approximately 90 days out, then, and a pre-sentence report will be ordered.

Anything else, from either side?

MR. MOLLOY: No, Your Honor.

MR. ROSENTHAL: No, Your Honor.

THE COURT: All right. We'll be in recess.

THE CLERK: I just got in. If you'll wait one second. April 12th, at 2:30.

THE COURT: All right. Counsel? Hang on a second, Mr. Rios.

We got in the computer, so can I give you the date for sentencing and for the violation of supervised release hearing. It's April the 12th, 2010, at 2:30 in the afternoon.

All right. Thank you. We'll be in recess now.

-- -- -- -- -- -- -- --

(Thereupon, at 11:26 o'clock a.m., the above-entitled matter was concluded.)

-- -- -- -- -- -- -- --

CERTIFICATE

I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN THE ABOVE-ENTITLED MATTER.


Dated this 13th day of July, 2010.


/s/ Jeffrey G. Thomas
JEFFREY G. THOMAS, RPR